IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**FILED**

Jun 29, 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

MICHAEL DWAYNE MAU, JR.,

                Petitioner,

        vs.

CLARK DUCART, Warden, Pelican Bay
State Prison,[1]

              Respondent.

No. 2:14-cv-01021-JKS

MEMORANDUM DECISION

Michael Dwayne Mau, Jr., a state prisoner now represented by counsel, filed a Petition

for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Mau is in the custody

of the California Department of Corrections and incarcerated at Pelican Bay State Prison.

Respondent has answered, and Mau has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On June 30, 2010, Mau was charged with murder, six counts of attempted murder,

shooting at an inhabited building, possession of a firearm by a felon, possession of a firearm

after being convicted of making criminal threats, unlawful possession of a firearm by a gang

member, possession of a loaded firearm by a gang participant, and participation in a criminal

street gang.  The information further alleged the personal and intentional discharge of a firearm

during commission of a felony causing great bodily injury or death, that a principal personally

and intentionally discharged a firearm proximately causing bodily injury or death, and an offense

---

[1]     Clark Ducart is substituted for Bond as Warden, Pelican Bay State Prison.  FED.
R. CIV. P. 25(d).

committed to benefit a street gang.  Mau denied the charges and allegations and proceeded to a

jury trial on October 19, 2010.  On direct appeal of his conviction, the California Court of

Appeal laid out the following facts underlying the charges against Mau and the evidence

presented at trial:

> ### [Mau] and Others at the Shooting
> [Mau] is a member of the South Side Tracy Norteño criminal street gang.  On the night of October 9, 2009, [Mau] gathered at a gang member's house with several friends, including fellow gang members Mark Garcia and Johnny Martinez.  [Mau] lifted his shirt and showed Garcia the gun in his waistband.  [Mau] said, "I got something for somebody, they get crazy."  Garcia interpreted this statement to mean, "If something happens, this is what's gonna protect us tonight."  Unbeknownst to [Mau], Garcia was working as a police informant.
>
> After 10:00 p.m., [Mau], Garcia, and Martinez went to Amore's, a restaurant that turned into a nightclub with a DJ after dinner.  Amore's was the scene of the shooting.
>
> There was a group at Amore's celebrating a birthday.  That group included Naim Bey, who was killed in the shooting, Raul Barajas, who was shot in the ankle, and Diocelina Morales, who was shot in the buttocks.
>
> Also at Amore's that night was a group associated with the city of Hayward.[FN1] This group included Jeffrey Manglona and Antonio Cabral.  Although Manglona and Cabral were directly involved in the fight that preceded the shooting, no one in the Hayward group was injured in the shooting.

> > FN1.   There was no evidence that the Hayward group was composed of gang members or rivals of the South Side Tracy Norteños.

> Several of [Mau's] friends and acquaintances were gathered at Amore's that night. Isaac Gonzalez arrived with Hector Virgen.  Virgen was involved in the initial confrontation and Gonzalez was shot in his little finger.  Carlos Santana was with his brother Alfred; they both knew [Mau], Garcia and Martinez.  Carlos was shot in the leg.[FN2]  Kenny Thomas, who knew [Mau], came with Steven Castro.  Thomas was shot in the ankle.  Castro was shot in the thigh and suffered nerve damage as a result.

> > FN2.   Because they share the same last name, we refer to Carlos and Alfred by their respective first names.  After the shooting, Carlos called Garcia and told him, "Your fucking homie just shot me."  Although he was a victim, Carlos initially refused to testify at trial, claiming not to remember anything.  After he was appointed counsel, Carlos testified.

***The Fights and the Shooting***

      A surveillance camera at Amore's [Mau] raising his shirt to show Thomas something. Although Thomas denied it was a gun, during the trial he told someone that it was a gun. Asked why he did not say anything, Thomas explained that he could not say anything because he knew "all these cats, they all know where I live." The camera also caught [Mau] talking to Garcia and making a hand gesture like a gun after Manglona walked by.

      Upstairs at Amore's, Manglona and Virgen got into an argument and punched each other. Security broke up the fight.

      The altercation restarted on the stairs and downstairs on the dance floor. Words were exchanged and punches were thrown. On one side, Manglona and Cabral, of the Hayward group, threw punches, some of which struck [Mau]. Several witnesses described at least one punch to defendant as a "sucker punch" or "cheap shot." [Mau], Garcia, and Martinez were all fighting.

      Security broke up the fight and escorted [Mau], Garcia, and Martinez out the side door. As [Mau] was being ejected, he made a hand motion to the Hayward group to come out. Moments later, while outside, [Mau] pulled out a gun and fired multiple times through the door.

      A nearby police officer heard the shots. The police arrived at a chaotic scene; people were screaming and running in all directions. There was blood "everywhere" inside Amore's. Bey was unresponsive on the floor with a fatal gunshot wound to his head. The police found more victims. There were bullet holes in the door and casings from a nine-millimeter handgun in the parking lot.

      Garcia called his handler, Detective Ramirez, and told him about the shooting. Ramirez instructed Garcia to find the gun. Later, Garcia called the police and told them that defendant was in a motel in Manteca. [Mau] was arrested in Manteca when he went out for breakfast the next morning. When Garcia visited [Mau] in jail and asked where the gun was, [Mau] said someone had gotten rid of it.[FN3]

          FN3.  Martinez was charged as an accessory after the fact; he pled guilty and testified under a grant of immunity. [Mau's] girlfriend at the time, with whom he spent the night after the shooting, was also charged with being an accessory after the fact and pled to a misdemeanor. She also testified under a grant of immunity.

***Gang Evidence***

      Michael Richards, a detective in the gang unit of the Tracy Police Department, testified for the People as a gang expert. He testified that South Side Tracy was a subset of the Norteño criminal street gang. There were about 400 Norteños in Tracy and about 50 South Side Tracy Norteños. South Side Tracy Norteños associated with the color red, the number 14, and the "huelga bird," a symbol of the United Farm Workers. The principal activities of South Side Tracy Norteños were murder, assault with a deadly weapon, possession of firearms, sales of narcotics, robberies, carjackings, and theft. To

show the gang embraced a pattern of criminal activity, Richards testified about two Norteños in Tracy that had recent gang-related felony convictions.

Richards opined that [Mau] was an active South Side Tracy Norteño. His opinion was based on [Mau's] prior contacts with law enforcement, his associating with gang members, his past pattern of activity, his clothing, and his admissions. In addition, [Mau] had gang tattoos: "south" inside his right forearm and "side" inside his left forearm.

Without objection, Richards described 29 separate contacts between [Mau] and law enforcement from May 2005 to December 2008. In the first, after a gang-related stabbing, [Mau] followed witnesses and yelled, "snitch." A few months later, [Mau], Martinez, and Garcia were contacted in McDonald Park (a known South Side Tracy Norteño area), after dark in violation of the municipal code. On September 10, 2005, [Mau] was stopped and ticketed for driving without a license; he was in the company of two known Norteños.

In January 2006, [Mau] was injured in a large fight occurring at government housing. He was taken to the hospital, but did not cooperate with the investigation. Richards opined that this incident was [Mau's] being "jumped" into the gang. A few weeks later, [Mau] was arrested for possession of cocaine base for sale, and was wearing a red T-shirt. In May 2007, [Mau] was implicated in a vehicle burglary with Martinez.

The remaining contacts involved instances where [Mau] was in the company of known gang members, wearing clothing associated with the gang (a red shirt, a red bandanna or do-rag, a belt buckle with 14 on it, a black and red sweatshirt, or a sweatshirt with South Side Tracy on it), or the police noted his gang tattoos. In one instance, [Mau] admitted to police that he was a South Side Tracy Norteño. On another occasion he was found in possession of the Norteño 14 bylaws.

Richards explained that respect was the ultimate issue in gangs. A gang member earned respect by causing fear and intimidation in others. To earn more respect, a gang member needed to intimidate more, like controlling a neighborhood so people would not cooperate with the police. Word spread quickly on the street, and the public often would not cooperate with the police on gang-related crimes.

In response to a direct question, Richards gave his opinion that [Mau] committed "these felonies for the benefit of, at the direction of or in association with a criminal street gang with the specific intent to promote, further or assist in any criminal conduct by gang members." The basis of his opinion was [Mau's] long history of associating with known gang members, wearing clothing indicative of a gang, admitting gang membership, and having gang tattoos. Richards explained that on the night in question [Mau] met with other gang members at the house of a known gang member. There, he showed Garcia a gun and said it was for any problems that night. At the bar there was a fight; [Mau] was sucker-punched and quickly escorted out with Garcia and Martinez before he could retaliate. Richards explained that was the ultimate disrespect. In order to maintain status within the gang, show that Norteños will not be intimidated in their own area, demonstrate that he was not weak, and show willingness to use his gun, [Mau] pulled out the gun and fired multiple times into the occupied bar.

Richards opined, [Mau] was an active participant in the South Side Tracy subset of the Norteño criminal street gang the night of the shooting.

*People v. Mau*, No. C067198, 2012 WL 6101904, at *1-3 (Cal. Ct. App. Dec. 10, 2012).

At the conclusion of trial, the jury convicted Mau of second-degree murder, six counts of attempted murder, and shooting into an occupied building, all with enhancements for benefitting a gang and personal use of a firearm causing death or great bodily injury.  Mau was also convicted of various firearm offenses and being an active gang participant.  The trial subsequently sentenced Mau to 254 years and 8 months to life imprisonment.

Through counsel, Mau appealed his convictions, arguing that: 1) there was insufficient evidence to support the gang enhancements; and 2) counsel was ineffective for failing to object to the gang expert: a) offering an opinion on an ultimate fact, and b) recounting 29 incidents of Mau's contact with law enforcement.  Mau also raised three sentencing errors, two of which the People conceded.  The Court of Appeal issued a reasoned, unpublished decision modifying Mau's sentence as agreed by the parties, but otherwise affirming the judgment against Mau in its entirety.  *Mau*, 2012 WL 6101904, at *10.  Mau petitioned for review in the California Supreme Court, which was summarily denied on February 20, 2013.

Mau then filed a *pro se* petition for habeas relief in the superior court.  In that petition, Mau argued that he received ineffective assistance of counsel because counsel failed to: 1) present a voluntary intoxication defense; 2) investigate or present expert testimony regarding Mau's mental state and voluntary intoxication; 3) investigate the patrons at the bar about Mau's drinking; 4) investigate the facts properly and prepare for trial; 5) consult with or put on an expert to evaluate Mau's mental state; 6) present evidence that Mau did not have the mental state to commit specific-intent crimes; and 7) obtain a psychological evaluation of Mau by a qualified mental health expert to determine that Mau's behavior on the night of the shooting was

consistent with an alcoholic blackout or an amnesiac state.  Mau further alleged that he received

the ineffective assistance of appellate counsel as a result of counsel's failure to raise the

foregoing trial counsel errors.  On May 15, 2014, the superior court issued a reasoned,

unpublished opinion denying the habeas petition.  Mau raised the same claims in a *pro se*

petition to the California Supreme Court, which was denied without comment on September 10,

2014.

While his state habeas petitions were pending, Mau timely filed a Petition for a Writ of

Habeas Corpus to this Court on April 22, 2014.  *See* 28 U.S.C. § 2244(d)(1)(A).  Mau moved for

a stay to pursue his claims in state court, which was granted.  Docket No. 7.  After the Supreme

Court denial, Mau promptly moved to lift the stay and also moved for the appointment of

counsel, alleging that he cannot read or write.  Docket Nos. 8, 9.  Through a previously-assigned

magistrate judge, the Court lifted the stay and appointed counsel for Mau.  Docket No. 12.

Rather than re-draft the Petition, appointed counsel moved to amend the Petition with another

*pro se* filing apparently prepared by Mau himself.  Docket No. 15.  Respondent answered, and

counsel filed a reply.  Docket Nos. 27, 30.  Briefing is now complete, and the Amended Petition

(Docket No. 10) is before the undersigned judge for adjudication.

## II. GROUNDS RAISED

In his Petition before this Court, Mau argues that: 1) the street gang enhancements were

not supported by legally sufficient evidence; 2) trial counsel was ineffective for failing to object

to "inflammatory . . ., speculative and cumulative" gang expert testimony; 3) trial counsel was

ineffective for failing to investigate Mau's level of intoxication on the night of the shooting; and

4) appellate counsel was ineffective for failing to raise the ineffective assistance of trial counsel claim.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Here, the only decision on Simmons' collateral review claims was a summary denial by the California Supreme Court on habeas review, which is an adjudication on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.   <u>Insufficiency of the Evidence</u> (*Ground 1*)

Mau first argues that the jury's gang findings were unsupported by substantial evidence. He argues that there was no evidence that he committed the crimes to benefit the gang: there was no evidence of gang rivalry that night or that the fight was gang-related, and there were no gang signs or proclamations or publications that the crimes were to benefit the South Side Tracy Norteños.

On direct appeal, the Court of Appeal rejected Mau's challenge as follows:

> Here, the People's expert witness testified that violent crimes increase "respect" for the gang and facilitate its criminal activities by creating fear and intimidating law-abiding neighborhood residents.  Murder and assault were primary criminal activities of the South Side Tracy Norteño gang.  A reasonable jury could infer, based on this testimony and other evidence in the record, that [Mau] intended for the shooting to have the predicted effect of intimidating neighborhood residents, "thus facilitating future crimes committed by himself and his fellow gang members."  (*People v. Vazquez* (2009) 178 Cal.App.4th 347, 353 (*Vazquez*).)  "A community cowed by gang intimidation is less likely to report gang crimes and to assist in their prosecution.  The gang benefit is plain."  (*People v. Margarejo* (2008) 162 Cal. App. 4th 102, 110.)
>
> Although there was no evidence that [Mau] announced or displayed his gang membership while inside Amore's or during the shooting, there was evidence that several of the people in Amore's knew [Mau] and his status as a gang member.  One witness told the police there were "south siders" present that night.  There was also evidence that the shooting, due to its gang-related nature, caused fear and intimidation.  During trial, Thomas told a friend of the Bey family that he could not talk about the gun [Mau] showed him because "these cats" knew where he lived.  Manglona testified he was afraid for his children.  Although she denied being afraid, Garcia's sister did not want to testify.
>
> There was also substantial evidence that [Mau] met the second prong of section 186.22, subdivision (b), "the specific intent to promote, further, or assist in any criminal conduct by gang members."  The entire night was colored by [Mau's] gang activities and his adherence to the gang code.  The evening began with [Mau] associating with fellow gang members and showing Garcia the gun he had for protection.  His actions indicate he was on the lookout for trouble and ready and willing to use force if it arrived; he announced his willingness and ability to avenge any slight or perceived "disrespect" to the gang.  [Mau] took exception to the presence of the group from Hayward, making gun gestures to Garcia, and showing Thomas his gun.  When the situation escalated, [Mau] joined in the fight.  As Richards explained, when [Mau] was sucker-punched and ejected without an opportunity to retaliate, he faced the ultimate "disrespect."  To preserve his gang status and advance the interest of the South Side Tracy Norteños, he took revenge by shooting indiscriminately into Amore's.  From the evidence of [Mau's] gang membership, his motivation for the crimes to benefit the gang, and his commission of the crimes in the presence of fellow gang members, the jury could "fairly infer that the defendant also intended for his crime to promote, further or assist criminal conduct by those gang members."

*Mau*, 2012 WL 6101904, at *5.

As articulated by the Supreme Court in *Jackson*, the constitutional standard for

sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to

the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005). A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has

spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  It is through this lens that this Court must view an insufficiency of the evidence claim.

To sustain a jury's gang enhancement finding, "there must have been evidence upon which a rational trier of fact could find that [the petitioner] acted with the 'specific intent to promote, further, or assist in' *some* type of 'criminal conduct by gang members,' which may include the crimes of conviction." *Emery v. Clark*, 643 F.3d 1210, 1216 (9th Cir. 2011) (per curiam) (citation omitted).  The Ninth Circuit previously held in *Garcia v. Carey*, 395 F.3d 1099 (9th Cir. 2005), and *Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009), that the "gang enhancement can only be applied when the defendant had the specific intent to facilitate gang members' criminal activities *other than* the charged crime." *Emery*, 643 F.3d at 1215.  The California Supreme Court explicitly disapproved of that interpretation in *People v. Albillar*, 244 P.3d 1062 (Cal. 2010), and the interpretation is no longer binding in this Circuit.  *See Emery*, 643 F.3d at 1215-16 (recognizing "that the California Supreme Court has overruled *Briceno* and *Garcia's* interpretation of [California Penal Code] section 186.22(b)(1)" and applying "the California Supreme Court's authoritative interpretation of section 186.22").  Thus, "[t]here is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." *Albillar*, 244 P.3d at 1075-76 (citations omitted).

In this case, the majority of evidence that Mau's acts were gang-related and thus were subject to the gang enhancement were provided by a gang expert who testified that an individual may act in retaliation to preserve his status in the gang, as well as the overall status of the gang. This testimony falls within the recognized scope of permissible expert testimony as to gang

culture, habits, and motivation.  *In re Frank S.*, 46 Cal. Rptr. 3d 839, 842 (Cal. Ct. App. 2006)

("It is well settled that a trier of fact may rely on expert testimony about gang culture and habits

to reach a finding on a gang allegation.").  "[B]ecause a motive is ordinarily the incentive for

criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is

permitted in admitting evidence of its existence."  *People v. Lopez*, 81 Cal. Rptr. 386, 391 (Cal.

Ct. App. 1969) (citation and internal quotation marks and brackets omitted).

The Court agrees with the state court's determination that the expert's testimony

provided sufficient evidence regarding Mau's involvement in the South Side Tracy Norteños

gang and to prove the elements required for finding a criminal street gang enhancement.  In

making this determination, the Court is cognizant of the California Supreme Court's warning

that "[n]ot every crime committed by gang members is related to a gang."  *Albillar*, 244 P.3d at

1071.  Even "when two or more gang members commit a crime together, they may be on a frolic

and detour unrelated to the gang."  *Emery*, 643 F.3d at 1214 (citing *Albillar*, 244 P.3d at 1072).

Here, however, there was sufficient evidence from which a reasonable factfinder could

conclude that Mau's actions were more than just a "frolic and detour."  Prior to going to the bar,

Mau smoked marijuana with Garcia, Martinez, and other gang members and exhibited a gun and

said it was "something for somebody" in case "they get crazy."  At the bar, tensions arose

between members of the gang and Manglona's group, which eventually turned into physical

altercations between the two groups.  Mau could be seen making gun gestures with his fingers

and lifting his shirt to show a fellow gang member what was believed to be a gun in Mau's

waistband.  Mau was hit in the head prior to being forcibly ejected from the bar.  A reasonable

factfinder could believe that Mau's shooting after he and other gang members were punched and

ejected established the specific intent requisite for the gang enhancement because Mau was acting to benefit the gang by enhancing the gang's reputation for violence.

It is certainly true that the Court of Appeal's decision in this case is arguably inconsistent with the decision in *In re Daniel C.*, 125 Cal. Rptr. 3d 337, 347-48 (Cal. Ct. App. 2011), in which the First District of the California Court of Appeal held that a juvenile court erred in finding the gang enhancement to be true where, as here, the defendant was the only gang member charged and convicted. However, "[i]n California, decisions of coordinate courts are strongly persuasive, but not binding." *Johnson v. McCoy*, 278 F.2d 37, 40 n.5 (9th Cir. 1960) (citations omitted). Mau's case arose in the Third District, and therefore the Mau court was not required to follow *In re Daniel.* But in any event, *In re Daniel C.* is distinguishable from the case at hand. There, in concluding that the evidence was insufficient to support the specific intent element of the gang enhancement, the Court of Appeal noted that there was no evidence that the defendant was acting in concert with his companions when he robbed a liquor store in part because there was no evidence that the defendant's companions were with him when the incident happened or that the victim was aware that the defendant or his companions were gang members. *Id.* at 343-345. Here, however, there was evidence that Mau committed the shooting while accompanied by other gang members after an altercation between gang members and non-gang members where the gang members got punched and ejected from a bar. Thus, there was sufficient evidence from which jurors could reasonably infer the necessary intent.

Moreover, as there is no requirement that the prosecution prove intent to otherwise benefit the gang, Mau's claim that sufficient evidence did not support the Court of Appeal's conclusion that the shooting benefitted the gang's future activities is not relevant. When viewing

-13-

the circumstantial evidence presented by the expert witness in the light most favorable to the

prosecution, a jury could reasonably infer that Mau committed the charged offenses beyond a

reasonable doubt "in association with" the South Side Tracy Norteños gang and that he did so

"with the specific intent to promote, further, or assist in any criminal conduct by gang members"

pursuant to Penal Code § 186.22(b)(1).  *See also People v. Romero*, 43 Cal. Rptr. 3d 862, 865

(Cal. Ct. App. 2006) (explaining that § 186.22 enhancement may be proven with expert

testimony about criminal street gangs).

In sum, the Court concludes that the state court's denial of Mau's sufficiency of the

evidence claim with respect to the gang enhancement was not contrary to nor did it involve an

unreasonable application of clearly established federal law, and it did not constitute an

unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).  Accordingly, because Mau

fails to establish by clear and convincing evidence that the state court's factual findings were

erroneous and the record does not compel the conclusion that no rational trier of fact could have

found proof that the shooting was committed with the intent to benefit a street gang, Mau cannot

prevail on this legal insufficiency claim.

B.      <u>Ineffective Assistance of Counsel</u> (*Grounds 2, 3, 4*)

Mau additionally challenges the performance of his trial and appellate counsel.  To

demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must

show both that his counsel's performance was deficient and that the deficient performance

prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which

"counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Mau must show that either his trial or appellate counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for either counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

1.     Expert Gang Testimony

Mau first contends that trial counsel was "ineffective in permitting the admission of/and failing to object to inflammatory . . ., speculative and cumulative evidence of uncharged act[s] and other gang-related testimony."  At trial, the gang expert recited Mau's 29 contacts with law enforcement from May 2005 to December 2008 to explain his opinion that Mau was an active member of the South Side Tracy Norteños gang.  Defense counsel did not object.

On direct appeal, the Court of Appeal concluded that the evidence was admissible because "the challenged evidence was directly relevant to and probative of the gang offense and the gang enhancements."  *Mau*, 2012 WL 6101904, at *8.  And contrary to California case law finding an abuse of discretion in admitting cumulative evidence concerning issues not reasonably subject to dispute:

> [T]he evidence was admitted only once and not dwelled upon.  The evidence of [Mau's] 29 prior contacts with law enforcement consumes only 11 pages in a reporter's transcript of over 2400 pages.  There is no indication the trial court intended to allow the prosecution the unfettered opportunity to "over-prove their case or put on all the evidence that they have."

*Id.* (citation omitted).

When a habeas petitioner argues that his trial counsel rendered ineffective assistance by failing to object to certain evidence as inadmissible under the state's evidentiary rules, the state court's determination that the evidence at issue would have been properly admitted at trial under state law establishes that counsel's failure to object was neither deficient performance nor prejudicial for purposes of the Sixth Amendment.  *See Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (rejecting claim that counsel was ineffective for failing to object to rape victim's

testimony where state appellate court ruled that the evidence would have been admitted under a

different California evidence rule).  Accordingly, relief is foreclosed here.

In any event, as the Court of Appeal concluded in the alternative, Mau fails to establish

prejudice:

> First, the court gave the jury an instruction on the proper, limited use of this evidence—specifically that it was not to be used to show that defendant was of bad character or had a criminal disposition.[FN6]  We presume that the jury followed these instructions.
>
> > FN6.   The court instructed the jury: "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and enhancements charged, or the defendant had a motive to commit the crimes charged, or the defendant acted in the heat of passion. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from the evidence that the defendant is a person of bad character or that he has a disposition to commit crime."
>
> Second, the potential for prejudice is decreased where the testimony describing defendant's uncharged acts is no stronger and no more inflammatory than the testimony concerning the charged offenses.  That is the case here.  The evidence of possible criminal activity in [Mau's] contacts with law enforcement was considerably less inflammatory than the evidence at trial of his indiscriminate shooting that killed one person and wounded six others, none of whom had done anything to provoke the shooting.  Further, the evidence of these charged crimes was very strong; indeed the evidence of guilt was overwhelming.  There was evidence from both of [Mau's] companions that he was the shooter.  Garcia testified directly to that fact.  While Martinez declined to identify [Mau] as the shooter at trial, there was evidence that he told others that night that [Mau] was the shooter.

*Mau*, 2012 WL 6101904, at *8 (citations omitted).

The Court of Appeal's finding of no prejudice is both reasonable and fully supported by

the record.  Mau therefore cannot prevail on this claim in any event.

-17-

In his counseled Traverse, Mau more clearly raises a claim, raised to the state courts on direct appeal, that trial counsel was ineffective for failing to object to the gang expert's testimony on an ultimate issue.  Notwithstanding the propriety of raising a claim in a Traverse where, as here, the Traverse is the first counseled submission, this claim is without merit.  Mau argues that this testimony violated state law, but federal habeas relief is not available for errors of state law.  *Estelle*, 502 U.S. at 67-68.  He additionally argues that the testimony deprived him of due process in violation of federal law, but under federal law, there is no support for "the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact."  *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). " [I]t is 'well-established . . . that expert testimony concerning an ultimate issue is not per se improper.'  Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'"  *Id*. (internal citations omitted); *see also Duvardo v. Giurbino*, 410 F. App'x 69, 70 (9th Cir. 2011) (noting that the Supreme Court "has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause"); *Briceno*, 555 F.3d at 1077-78 (rejecting claim that gang expert's testimony that "the crimes [the defendants] were involved in benefit the gang itself, the action that they have done to glorify the gang" was unconstitutional because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue").  Mau therefore cannot prevail on that argument either.

2.      Failure to Investigate and Present Voluntary Intoxication Defense

Mau next contends that trial counsel was ineffective for failing to investigate Mau's level

of intoxication and present a defense that, although Mau was the shooter, his level of

intoxication rendered him unable to form the requisite malice aforethought for specific intent

crimes.  Mau likewise alleges that appellate counsel was deficient for failing to raise on direct

appeal an ineffective assistance claim on this basis.

As a preliminary matter, and as he did in his habeas petitions to the state courts, Mau

offers only conclusory and somewhat confusing assertions, unsupported by any competent

evidence, such as a declaration from trial counsel, in support of these claims.  Because Mau has

failed to meet his burden of proof on habeas, he is not entitled to relief, and his ineffective

assistance of counsel claim should be rejected on that basis.  *See Bragg v. Galaza*, 242 F.3d

1082, 1088 (9th Cir. 2001) (finding that mere speculation that witness might have given helpful

information if interviewed insufficient to establish ineffective assistance of counsel); *Dows v.

Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective-assistance-of-counsel claim based

on counsel's failure to interview or call alibi witness because petitioner provided "no evidence

that this witness would have provided helpful testimony for the defense"); *see also Turner v.

Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) ("self-serving statement" insufficient to raise claim

for relief).

In any event, the claims are without merit.  Although California Penal Code § 22

provides for the admission of evidence of voluntary intoxication on the issue of whether a

defendant actually harbored express malice aforethought, as the superior court found in rejecting

this claim on state habeas review, "[Mau's] own trial testimony clearly shows that he was not in

a 'black out state' during the incident."  The superior court cites to Mau's testimony as follows:

> In fact, [Mau] testified that "I wasn't drunk where, you know what I'm saying, I
> don't remember nothing.  But I do remember a lot of it."  He also testified, "Yeah, I
> would call it buzzing.  I wouldn't say I was super drunk, but I was buzzing, yes."
> Additionally, he testified that he made three separate drug transactions, using a scale to
> measure the quantity of the marijuana, out of his vehicle or the buyer's vehicle that night
> at the club.  [Mau] later in his testimony changes this statement and says that not all three
> times were for drug deals, that he sometimes went out to his vehicle to roll up a blunt or
> smoke out of his bong.
> The evidence in opposition to [Mau's] contention that he was severely intoxicated
> is his testimony wherein he states, "I was like, 'Let's go before the cops come.'  I didn't
> want to get a violation of probation for being around gang members."  [Mau] also
> testified, "Well, yeah.  Iw as like, well, I have to leave because of another violation of my
> probation wouldn't be good, and I know it would take me away from my family."

The conclusion of the superior court is both reasonable and fully supported by the record.

Accordingly, Mau's own testimony contradicts a theory that Mau was so intoxicated that he

could not form express malice.  Trial counsel was not ineffective for failing to investigate and

present a defense that was not only not supported by the evidence, but was contradicted by it.

*See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996) (defense counsel's failure to raise a

meritless argument or to take a futile action does not constitute ineffective assistance of counsel).

Consequently, appellate counsel cannot be faulted for failing to raise such a claim.  *See Jones v.*

*Barnes*, 463 U.S. 745, 751-52 (1983) (appellate counsel does not have an obligation to raise

every nonfrivolous argument); *Turner*, 281 F.3d at 872 ("A failure to raise untenable issues on

appeal does not fall below the *Strickland* standard.").  Mau is therefore not entitled to habeas

relief on this claim.

## V. CONCLUSION AND ORDER

Mau is not entitled to relief on any ground raised in his Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 29, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge